**In re BANK OF NEW ENGLAND CORPORATION, Debtor.**

**Ben S. BRANCH, Trustee, Plaintiff,**

v.

**HILL, HOLLIDAY, CONNORS, COSMOPOULOS, INC. ADVERTISING, Defendant.**

Bankruptcy No. 91–10126–WCH.

Adv. Nos. 93–1015, 93–1175.

United States Bankruptcy Court,
D. Massachusetts.

April 12, 1994.

Daniel M. Glosband, Anthony M. Feeherry, Nancy A. Dolberg and John Loughnane, Goodwin, Procter & Hoar, Boston, MA, for Hill, Holliday, Connors, Cosmopoulos, Inc. Advertising.

Hugh M. Ray, Robin Russell, Thomas R. Kline and Thomas E. Starnes, Andrews & Kurth L.L.P., Houston, TX, for trustee.

DECISION ON DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT AND
RELATED MOTION TO STRIKE

WILLIAM C. HILLMAN, Bankruptcy
Judge.

In these consolidated adversary proceedings the plaintiff, Chapter 7 trustee of a bank holding company ("Branch"), seeks recovery of voidable preferential and fraudulent transfers under 11 U.S.C. §§ 547 and 548 allegedly received by the defendant, Hill, Holliday, Connors, Cosmopoulos, Inc. Advertising ("HH"). Branch has abandoned certain state law claims which appear in Count III of both the First Amended and Second Amended complaints. *Branch Opposition n. 2* The remaining claims are core proceedings under 28 U.S.C. § 157.

I allowed Branch to amend his First Amended Complaint to bring in certain invoices not previously specified, with the understanding that the present motion would apply to the Second Amended Complaint. As to issues which involve the timing of payments, the invoices and payments detailed in the Second Amended Complaint are the appropriate data, and I authorized the parties to address those questions in supplemental memoranda which were duly filed.

Fed.R.Civ.P. 56, made applicable to adversary proceedings by Fed.R.Bankr.P. 7056, governs motions for summary judgment. It provides that:

> "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

The burden of proof is upon the moving party in the first instance. *In re Wang Laboratories, Inc.*, 155 B.R. 289, 290 (Bankr. D.Mass.1993). To defeat the motion, the opposing party must produce substantial evidence of a genuine dispute as to a material fact. *Darr v. Muratore*, 8 F.3d 854, 859 (1st Cir.1993); *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975), *cert. denied* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976). A

material fact is one which has the "potential to affect the outcome of the suit under applicable law." *Federal Deposit Insurance Corp. v. Anchor Properties*, 13 F.3d 27, 30 (1st Cir.1994) (quoting *Nereida–Gonzalez v. Tirado–Delgado*, 990 F.2d 701, 703 (1st Cir. 1993)).

In making its determination, the court "must view the record in the light most favorable to the party opposing the motion, and must indulge all inferences favorable to that party." *Oliver v. Digital Equipment Corp.*, 846 F.2d 103, 105 (1st Cir.1988).

### The Motion to Strike

As a preliminary matter, I must deal with HH's motion to strike a portion of the affidavit of Richard Holbrook.

HH's motion seeks summary judgment on all of Branch's claims raised in the complaint. HH argues, in part, that the challenged payments are subject to the "ordinary course of business" defense under § 547(c)(2). Branch filed an opposition to the motion with supporting affidavits. In response, HH filed "Motion to Strike Portions of Affidavit of Richard Holbrook" (the "motion to strike") arguing that portions of the Holbrook affidavit ("*Holbrook*" hereafter) violated Fed. R.Civ.P. 56(e), which provides that an affidavit submitted in support of or in opposition to a motion for summary judgment "shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated thereto."

The disputed ¶ 17 of the affidavit reads as follows:

> First, among the many creditors BNEC paid in late 1990, Hill Holiday stands out in my recollection as a vendor who requested that it be paid "upfront" for expenditures associated with a large advertising campaign planned for early 1991 to solicit additional deposits ("Deposit Campaign"). My understanding was that, before this, Hill Holliday's bills had generally been paid only after receiving detailed invoices from Hill Holiday to document the expenses or time charges. For that reason, I recall questioning Hill Holiday's request, and be-

ing informed that Hill Holiday might not perform services in connection with the Deposit Campaign unless BNEC complied with the request.

The quoted language lacks any statement that Holbrook received direct information from HH. HH asserts that the statements "I recall being informed" and the like (the "statement"), repeated throughout the paragraph, cause the substantive content to constitute inadmissible hearsay. Branch argues, in his opposition, that the above statements have a non-hearsay purpose, and they are also subject to the hearsay exception set forth in Rule 803(3) of the Federal Rules of Evidence.

The conversation referred to in the Holbrook affidavit took place between Holbrook (the "affiant") and an unknown BNEC employee (the "auditor"), not between the affiant and the HH employee who allegedly informed BNEC that HH wanted its payments "upfront". The HH employee may have communicated directly with the auditor who later related their conversations to the affiant. This triangle creates a double layer of hearsay.

Hearsay is defined as a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c).

A statement is not offered for its truth, and therefore is not hearsay, when the purpose of offering the statement is to show its probable effect upon the state of mind of another person who heard the statement. Russell, *Bankruptcy Evidence Manual*, 1993 Ed., § 801.5, *see also Moore v. Sears, Roebuck and Co.*, 683 F.2d 1321 (11th Cir.1982). Branch argues that the statements are not hearsay because "even if HH never made the request or threat concerning upfront payments that was reported to Mr. Holbrook, Mr. Holbrook's recollection that he was so informed is probative of the fact that BNEC *perceived* that pressure was being asserted . . ." *Opposition to Defendant's Motion to Strike p. 2* (emphasis in original). Assuming that BNEC's perception is relevant to the issues before me, the argument still fails.

If the conversation had taken place between the affiant and the HH employee, an argument could be made that the statement is being offered to show its effect on the affiant (and BNEC) rather than for its truth. However, because the affiant did not get his information directly from the HH employee, but rather through the auditor, the Court is being asked to accept the truth of the auditor's statement, i.e. that the HH employee *told* the auditor that HH wanted its payments to be made "upfront". The statement is hearsay.

■ Next Branch argues that if the statements are determined to be hearsay, they would still be admissible through the state of mind exception in Fed.R.Evid. 803(3). The rule provides that a hearsay statement expressing a declarant's then existing state of mind, emotion, sensation, or physical condition such as intent, plan, motive, design, mental feeling, pain and bodily health is admissible. But the declarant, as the one who made the original statement, is the HH employee who allegedly told the BNEC employees that HH wanted its payments made upfront. The exception would apply if Branch was trying to show the state of mind of the HH employee. Branch has repeatedly asserted that the statements are being offered to show the state of mind of Holbrook and the "institutional state of mind" of BNEC. The exception in Rule 803(3) is inapplicable.

Because the Court has determined that the statements in issue are inadmissible hearsay, we need not reach HH's second argument that the statements should be struck as based upon inadmissible opinion and legal conclusions.

The motion to strike has merit and is granted.

*Findings of Fact*

While findings of fact are not required in the present circumstances, Fed.R.Civ.P. 52(a), Fed.R.Bankr.P. 7052, a statement of the material facts is useful.

1. The Debtor, Bank of New England Corporation ("BNEC"), was a holding company for a variety of banking and non-banking subsidiaries. *See In re Bank of New England Corp.*, 134 B.R. 450, 471 (Bankr.

D.Mass.1991). Among the banks were Bank of New England, N.A.; Connecticut Bank & Trust Company, N.A.; and Maine National Bank. (Together with the other subsidiary banks, collectively "the Banks" hereafter). *First Amended Complaint ¶ 10; Answer to First Amended Complaint ¶ 10. ("C & A ¶ ——"* hereafter).

2. BNEC filed for relief under Chapter 7 on January 7, 1991.

3. HH provided advertising services to BNEC and its subsidiaries. *C & A ¶ 13.* The services were provided under an agreement between BNEC and HH dated as of December 23, 1987 but effective December 23, 1986. *Affidavit of Judith E. Shapiro, Ex. 1.* ("*Agreement*" hereafter). This was the only agreement between BNEC and HH. *Holbrook ¶ 7.*

4. HH's compensation for services rendered under the Agreement was to be paid as follows:

a. Professional advertising services on a time basis, billed monthly on or about the fifteenth of the month. *Agreement ¶¶ 2.A, 3.B.*

b. Media bills on a monthly basis at net cost, no commissions to be added, with each medium on a separate invoice, billed monthly at the beginning of the month. *Agreement ¶ 3.C.*

c. Special projects as agreed upon approval of an estimate. *Agreement ¶¶ 2.B, 3.A.*

5. The Agreement also provided that HH "shall act only as [BNEC]'s agent, and [HH] shall not be liable to any third party supplier except to the extent that [HH] receives payment from [BNEC] for such third party services." *Agreement ¶ 8.*

6. While the Agreement provided that invoices rendered to BNEC would be paid within ten days of the date of the invoice, *Agreement ¶ 4,* the practice was otherwise, as will be seen from what follows. HH received payments from BNEC between October 1, 1989 and January 7, 1991 under the Agreement. *Affidavit of John Cormier ¶¶ 5, 4.* ("*Cormier*" hereafter). Of those payments, approximately 83% represented payments incurred by HH as BNEC's agent. *Cormier ¶ 7.*

7. During the period October 1, 1989–October 6, 1990 (the "pre-preference period"), BNEC paid 1,248 invoices rendered by HH totalling over $15,000,000. The average time elapsed between the invoice date and payment was 40 days, ranging from 3 days to 366 days. *Cormier ¶ 10.* HH provided evidence that a payment period of 30–45 days between invoice and payment is "within the custom and practice in the advertising industry." *Affidavit of Paul M. Slack ¶ 4.* In the three months immediately preceding the preference period, payments were made an average of 47.2 days after the invoice date. *Plaintiff's Supplemental Memorandum 2.* ("*Branch Supp.*" hereafter). In the final month of the pre-preference period, the elapsed time averaged 74.95 days. *Branch Supp. 3.*

8. During the 90–day preference period, HH received over $4,800,000 in payment of 352 invoices submitted to BNEC. *Cormier ¶ 12.* Of those challenged as preferences in the Second Amended Complaint, the average time elapsed between the invoice date and payment was 43.46 days, with a range of 22–79 days. *Branch Supp., Ex. 1, 5.* Analyzing by months, the average periods for October (partial), November, and December were respectively 46.15, 46.31, and 40.56. *Branch Supp. 3–4.*

9. During the period between October, 1989 and December, 1990, the average time between invoice and payment for all accounts handled by HH's Boston office was 42 days. *Cormier ¶ 15.*

10. On November 29, 1990, HH billed BNEC $360,000.00, representing estimated monthly time charges for November and December, 1990. HH contends that this was in the ordinary course of business. *Cormier ¶ 16.* BNEC's then Director of Marketing Services explained the practice as follows:

"At the close of business in December of each year during the Prepetition Period, the BNEC Marketing department was not able to accrue funds into the following year. Vendor bills received after mid-December 1990 would not be paid from the 1990 budget. Therefore, in an attempt to

pay November and December activity out of the appropriate yearly budget, it was not unusual for the Marketing Department to request that a vendor submit its November and December bills immediately following the close of business in November if there were adequate funds in that budget to pay the bills. It appears that in the case of the two payments described [above], the BNEC Marketing Department asked HH to submit its minimum monthly time charges for November and December 1990 at the end of November 1990 in order to pay them from the 1990 budget." *Affidavit of Judith E. Shapiro ¶ 16.* ("*Shapiro*" hereafter).

This practice has been described as "not unusual" for BNEC by its then Director of Corporate Accounting. *Affidavit of Bryan Texeira ¶ 18* ("*Texeira*" hereafter). Shapiro further asserted that the prepayment was not requested by HH. *Shapiro ¶ 17.* HH avers that it is not unusual among its clients for prepayment to be requested. *Affidavit of J. Terence Carleton ¶ 18.* The payments of these two invoices were made either after 18 days, according to Branch, *Branch Supp. Ex. 1, 6 n. 4,* or after 27 days, according to HH. *Cormier Ex. 2.*

11. BNEC's internal mechanism for allocation of advertising expense between its subsidiaries is explained in the Texeira and Holbrook affidavits. In brief:

a. BNEC established an annual advertising budget, which included amounts to be paid to HH and other vendors, allocated among its various subsidiaries. *Texeira ¶ 4, 5; Holbrook ¶ 10.* There were no specific "line items" for individual vendors, such as HH. *Holbrook ¶ 10.*

b. Each month BNEC would make accounting entries "either to reimburse BNEC or to provide BNEC with funds to make payments to HH." *Texeira ¶ 6.* "One twelfth of the yearly budget allocation was transferred from the Operating Banks and other subsidiaries monthly even though expenditures for HH advertising by BNEC may have been less than or more than one twelfth in a given month." *Id. ¶ 7.* The amounts were maintained in a demand de-

posit account in the name of BNEC. *Holbrook ¶ 12.*

c. The accounts of the subsidiaries were reconciled at year end. *Id. ¶ 10.*

12. Once the funds were in the hands of BNEC, Texeira described BNEC's "normal practice" as restricting the funds for use for the payment of advertising services and not generally for other purposes. *Texeira ¶ 13.*

### Discussion

### I. The Preference Claim

In Count I Branch asserts that each of the listed payments from BNEC to HH constituted a voidable preference as provided in 11 U.S.C. § 547(b):

"(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title."

The parameters of the inquiry were summarized last year by our circuit court:

"Once the movant presents sufficient competent evidence to entitle it to summary judgment as a matter of law, the nonmovant cannot rest merely on the averments and denials of its pleadings, but must set forth specific facts demonstrating

a genuine issue for trial. As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trial-worthy issue warrants summary judgment for the moving party."

*Ralar Distributors, Inc. v. Rubbermaid, Inc. (In re Ralar Distributors, Inc.)*, 4 F.3d 62, 67 (1st Cir.1993) (citations omitted).

### A. *Transfer of property of the debtor*

HH first contends that § 547(b) is inapplicable since the debtor had no interest in the fund from which the payments were made and hence no "interest of the debtor in property" was transferred.

■ Under the "earmarking" doctrine, funds paid to a debtor by a new lender under an agreement that the funds will be repaid to an old lender do not become the subject of a preferential transfer when the contractually mandated payment is made. The principle has been recognized in the First Circuit. *Kapela v. Newman*, 649 F.2d 887, 892 (1st Cir.1981). Both sides agree that this case does not present a pure earmarking situation, but HH argues that it is closely analogous to earmarking, and that the same conclusion should be reached. I regard the issue as being somewhat broader, but perhaps my difference with HH is only semantic.

■ A debtor had an interest in property for § 547(b) purposes if, but for the transfer, the property would have been "property of the estate" under § 541. *Ralar, supra,* citing *Begier v. Internal Revenue Service*, 496 U.S. 53, 58, 110 S.Ct. 2258, 2263, 110 L.Ed.2d 46 (1990).

Section 541 provides that

"property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest ... becomes property of the estate ... only to the extent of the debtor's legal title to such property, but not· to the extent of any equitable interest in such property that the debtor does not hold."

11 U.S.C. § 541(d).

■ What constitutes property of the estate is a federal question to be resolved under § 541; however, the nature and extent of the debtor's interest is determined by reference to non-bankruptcy law. *Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); *Morton v. National Bank (In re Morton)*, 866 F.2d 561 (2d Cir. 1989). State law stakes out the dimensions of a debtor's interest in property. *In re Nejberger*, 934 F.2d 1300, 1302 (3d Cir.1991). Section 541 eliminates exclusive reliance on state law in determining what constitutes property of the estate but recognizes "the traditional role of the states in creating and defining the underlying property interests and commercial arrangements to which bankruptcy law applies." *Selby v. Ford Motor Co. (In re Frimberger Corp.)*, 590 F.2d 642, 646 (6th Cir.1979).

When the asset at issue is funds in an account, it is necessary to determine the terms under which the funds are held. If the debtor's use of the funds is so restricted that the debtor cannot control their use, the account may not be property of the estate. It has been held that funds may stand in a bank account in the name of the debtor, carry the debtor's tax identification number, and still not be property of the estate. *In re Comprop Investment Properties, Ltd.*, 81 B.R. 101, 102 (Bankr.M.D.Fla.1987).

*Judge Lavien was faced with the same issue, although with much stronger facts, in Shipley Co. v. Darr (In re Tap, Inc.)*, 52 B.R. 271 (Bankr.D.Mass.1985). The debtor was a data processing business which provided payroll services for its clients. One of the functions of the service was to remit federal taxes as required by the Internal Revenue Service from the gross payroll funds deposited with it by clients. Relying upon a variety of Massachusetts and other cases and authorities, Judge Lavien ruled that when money was left with the debtor for the payment of a debt to a designated person, the money does not become the property of the debtor. *Id.* at 275. He did not find any requirement that

the funds be segregated or controlled by the payor.

HH contends that BNEC was forbidden by law from using the funds paid into the advertising account by the Banks for any other purpose, pointing to 12 U.S.C. § 371c. I do not read that section to support HH's position. I do not consider that the activities at issue are "covered transactions" as defined in 12 U.S.C. § 371c(b)(7) nor do I find the language of the statute, even if applicable, capable of sustaining the interpretation urged by HH. The regulatory materials cited, in particular *FRB Bank Holding Company Supervision Manual § 2020.6,* are not directed to the problem before me.

Branch argues that the funds cannot be considered restricted since there is no evidence that the Banks imposed restrictions on the use of the funds; BNEC had physical control of the funds and the ability to direct to whom the funds would be paid. If the funds had been specifically restricted, or had been held by the Banks rather than BNEC, HH's case would be much stronger, but I do not find those conditions to be a *sine qua non* of HH's position. As to the last element, I believe that the assertion that BNEC could appropriate the funds to other purposes—which would be a *mis*appropriation because of the nature of BNEC's undertaking—is not relevant. If it had done so, that is, applied sums from the advertising account which had been supplied by the Banks to its general corporate purposes, it might well have defeated a claim by HH that the funds were trust funds held for its benefit, *Research–Planning, Inc. v. Segal (In re First Capital Mortgage Loan Corp.),* 917 F.2d 424 (10th Cir.1990), but that is not the present case.

■ The funds were paid to BNEC by the Banks specifically to fund obligations to a narrow defined group of creditors, suppliers of advertising and related services. BNEC did exactly what it was supposed to do in making payments to HH. There was no profit element for BNEC involved; it was a straight pass-through of the funds. I find that *Tap, Inc.* is controlling. The advertising funds paid over to HH were never property of the estate of BNEC and hence there was no preferential payment.

In reaching this conclusion I have paid close attention to the remaining averments of the Holbrook affidavit but find it directed almost exclusively to a refutation of the application of the earmarking doctrine. It does not contradict any of the facts stated in the findings. Branch's "failure to come forward with sufficient evidence to generate a trial worthy-issue warrants summary judgment for the moving party." *Ralar, supra,* at 67.

**B.** *Ordinary course of business*

■ Even absent the prior conclusion, I would find that the payments are not avoidable.

The so-called "ordinary course" rule is found in 11 U.S.C. § 547(c)(2):

"(c) The trustee may not avoid under this section a transfer—

. . . .

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms"

**1.** *Debt incurred in ordinary course*

There is no issue raised in this regard. The debts in controversy were incurred under a contract which antedated the periods in question by several years and established the course of dealings between the parties. *Findings ¶ 3.*

**2.** *Payment made in ordinary course*

The purpose of this element of the exception is to leave normal financial relations undisturbed because an otherwise preferential transfer made in the ordinary course of business does not detract from the general policy of § 547(b) of discouraging unusual action by the debtor or its creditors during the debtor's slide into bankruptcy. *Branch*

*v. Ropes & Gray (In re Bank of New England Corp.),* 161 B.R. 557, 559 (Bankr. D.Mass.1993), citing *WJM, Inc. v. Massachusetts Department of Welfare,* 840 F.2d 996, 1010 (1st Cir.1988). It is invoked by demonstrating that the payment was ordinary in relation to the past practices between the debtor and the particular creditor. *Id.*

A primary measure of "ordinary course" is the time between invoicing and payment in the dealings between the parties on a historical basis. During the pre-preference period the average time of payment was 40 days, with a range of 3 to 366 days. *Findings ¶ 7.* During the preference period the average was 43.46 days, with a range of 22 to 79 days. *Findings ¶ 8.*

In *Ropes & Gray* I adopted the approach that one should take a "holistic view of the parties' ordinary business conduct." 161 B.R. at 561. Branch argues here, as he did in *Ropes & Gray,* that the periods should be subdivided for determination of the relevant gap period. I decline once again to start down that slippery slope, for there are more ways to subdivide a time period than to skin a cat, and I know of no standards for differentiating the meaningful from the meaningless. The appropriate determination is to treat the periods as a whole.

I find that the difference between 40 days and 43.46 days is not significant for the present purpose, and that the payments were made in the ordinary course of the dealings of the parties.

### 3. Payment in accordance with ordinary business terms

The most reasonable construction of this element is that the test is an objective one of industry standards—what is ordinary in the trade or business in which the creditor and debtor operate. *In re Narragansett Clothing Co.,* 146 B.R. 609, 611 (Bankr.D.R.I. 1992). Given the facts before me, I need not consider the even more liberal formulation that

"'ordinary business terms' refers to the *range* of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so idiosyncratic as

to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection C."

*In re Tolona Pizza Products Corp.,* 3 F.3d 1029, 1033 (7th Cir.1993) (emphasis in original), quoted with approval in *Fiber Lite Corp. v. Molded Acoustical Products, Inc. (In re Molded Acoustical Products, Inc.),* 18 F.3d 217, 219–20 (3d Cir.1994).

The evidence presented by HH in this regard consists of a statement by an officer of another advertising agency that the payments were made within industry standards. *Findings ¶ 7.* That evidence is not contradicted and satisfies movant's burden of proof.

### C. New value defense; Initial transferee issues

Having found two reasons for HH to prevail on its motion for summary judgment, I will not deal with the other theories advanced by it.

## II. The Fraudulent Transfer Claim

In Count II Branch alleges that certain payments to HH were fraudulent transfers and hence voidable under 11 U.S.C. § 548(a). As relevant here, that statute reads:

"(a) The trustee may avoid any transfer of an interest of the debtor in property ... that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made ..., indebted; or

(2)(A) received less than a reasonably equivalent value in exchange for such transfer ...; and

(B)(i) was insolvent on the date that such transfer was made ... or became insolvent as a result of such transfer...."

Once again we are concerned with whether "an interest of the debtor in property" was transferred. For the same reasons as stated above with regard to Count I, I find that there was no such transfer.

If there were in fact a transfer, HH defends as to "actual intent" under § 548(a)(1) on the grounds that Branch has failed to plead fraud with particularity. As to constructive fraud under § 548(a)(2), HH argues that BNEC received reasonably equivalent value.

### A. Failure to plead with particularity.

Branch's pleading is sparse, it is true, and a motion for a more definite statement might be well founded, but I could not grant summary judgment on that basis. There is, however, another reason why Branch's actual fraud demi-count must fail.

The law of this circuit regarding the demonstration of actual intent is well settled. Since "[i]t is often impractical, on direct evidence, to demonstrate an actual intent to hinder, delay or defraud creditors," *Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*, 926 F.2d 1248, 1254 (1st Cir.1991), fraudulent intent may be inferred from the circumstances surrounding the transfer, with particular emphasis on the badges of fraud. *Anchor Properties*, 13 F.3d at 32.

> "Among the more common badges of fraudulent intent at the time of a transfer are: (1) actual or threatened litigation against the debtor; (2) a purported transfer of all or substantially all of the debtor's property; (3) insolvency or other unmanageable indebtedness on the part of the debtor; (4) a special relationship between the debtor and the transferee; and (5) retention by the debtor of the property involved in the putative transfer."

*Id.*

Any sums paid by BNEC to HH were under a contract effective December 23, 1986. *Findings ¶ 3.* While the quoted list of badges of fraud is not exclusive, it is self-evident that payments under what appears to me to be a not unusual contract for advertising services is not the type of transfer contemplated under the rubric of actual fraud.

Since the Agreement is in evidence, and absent any contrary demonstration of genuine issues of fact by Branch, summary judgment is warranted. *Ralar*, 4 F.3d at 67.

### B. Reasonably equivalent value

The parties devote a great deal of time in their memoranda to issues involved in "down streaming" value for the benefit of subsidiaries, and the related issues of whether the financial health of the subsidiary makes a difference. See the discussion in *Branch v. Federal Deposit Ins. Corp.*, 825 F.Supp. 384 (D.Mass.1993). It does not make a difference here. The reasonably equivalent value which BNEC received was actual cash transfers from the subsidiaries which were disbursed to HH. *Findings ¶ 11.* The possibility of benefit to BNEC was not remote or contingent; it was actual and contemporaneous. The payments were not fraudulent transfers.

### Conclusion

For the reasons stated, orders will enter granting defendant's motions to strike and for summary judgment.