# United States Court of Appeals
## For the First Circuit

---

No. 02-2309

IN RE LAN TAMERS, INC.,
Debtor.

---

CITY OF SPRINGFIELD, MASSACHUSETTS,
Plaintiff, Appellee,

v.

DAVID W. OSTRANDER, Trustee in Bankruptcy,
Defendant, Appellant,

LAN TAMERS, INC.; BANK OF WESTERN MASSACHUSETTS;
EDUCATIONAL TECHNOLOGY, INC.; UNIVERSAL SERVICE
ADMINISTRATIVE COMPANY; OFFICIAL UNSECURED
CREDITORS' COMMITTEE OF LAN TAMERS, INC.,

Defendants.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor, U.S. District Judge]

---

Before

Boudin, Chief Judge,

Lynch and Howard, Circuit Judges.

---

Eugene B. Berman, Kerry David Strayer, and Kamberg, Berman, P.C. on brief for defendant-appellant.

Joseph B. Collins, George I. Roumeliotis, Hendel & Collins, Harry P. Carroll, Deputy City Solicitor, Melissa M. Shea, Associate City Solicitor, and Springfield Law Department on brief for plaintiff-appellee.

Joseph H. Baldiga and Mirick, O'Connell, DeMallie & Lougee, LLP on brief for Universal Service Administrative Company, amicus curiae.

_____

May 19, 2003

_____

**LYNCH**, **Circuit Judge**.  This case involves competing claims of the Springfield, Massachusetts public schools and the creditors of LAN Tamers, Inc., a bankrupt company, to a million-plus dollars.  The case arises from the intersection of the federal Bankruptcy Code and the federal "E-Rate" program, created by the Telecommunications Act of 1996 to encourage public schools to connect to the internet.  The E-Rate program subsidizes these internet connections with funds extracted from the telecommunications industry and administered by a private not-for-profit corporation, the Universal Service Administrative Company (USAC).  The schools contract with service providers to do the connection work.  USAC, through the Universal Service Fund (USF), either pays the subsidy to the service provider directly (if the approved schools have not already paid in full) or reimburses the schools for part of the cost (if the projects have been approved and the schools have paid the service provider for the work).  In the latter case, USAC actually makes its payment to the service provider, who in turn must pass the funds through to the school.

The issue here is whether reimbursement monies, presently held by USAC, are part of the estate of LAN Tamers, the bankrupt service provider.  When LAN Tamers filed for bankruptcy, Springfield had already paid it in full for installation and maintenance of internet networks at various schools.  USAC had already approved E-Rate funding for the projects.  The bankruptcy

court and district court both held that these funds belong to Springfield and are not the property of the estate. We affirm.

I.

The facts about the structure of the E-Rate program and the events are undisputed.

One of the goals of the 1996 Telecommunications Act was to encourage universal telecommunications service. Universal service includes "advanced telecommunications and information services," particularly high-speed internet access, for schools (as well as for libraries and rural health care providers). See 47 U.S.C. § 254(b)(6), (h)(1) (2000). The internet highway for these schools is paved with mandated contributions from the telecommunications industries; the USF's coffers are filled by interstate telecommunications providers who pay mandatory charges, which they typically pass on to consumers in their bills. See id. § 254(d); 47 C.F.R. § 54.706 (2002). Federal regulations give USAC the responsibility to administer the USF, collect the charges, and disburse its funds, all under the direction of the Federal Communications Commission (FCC). See 47 C.F.R. §§ 54.701, 54.702. The USF monies are not appropriated federal funds; nonetheless, they exist by reason of a federal mandate. The funds are not distributed by a federal agency but by USAC, a private nonprofit corporation, subject to regulation. See generally Tex. Office of Pub. Util. Counsel v. FCC, 183 F.3d 393, 405-09 (5th Cir. 1999)

-4-

(describing USF provisions of 1996 Telecom Act and subsequent regulations); R.F. Frieden, Universal Service, 13 Harv. J.L. & Tech. 395, 397-422 (2000) (same).

The E-Rate program implements the Telecom Act's mandate of USF support for schools.  See 47 U.S.C. § 254(b)(6).  In the past few years, USAC has disbursed between $1.4 billion and $1.7 billion annually in E-Rate funding for schools and libraries.  To receive funds, a school enters directly into a contract with a service provider to supply eligible telecommunications services.  See 47 C.F.R. § 54.504(c).  The service provider must be registered with USAC.  See USAC Service Provider Manual, ch. 4, available at http://www.sl.universalservice.org/vendor/manual/ (last visited May 15, 2003).  A school must complete an application process with multiple steps to have E-Rate support approved.  The amount of funding a school receives from the USF depends on the area's poverty level, and ranges from 20% to 90% of the total cost of eligible projects.  See 47 C.F.R. § 54.505(b).  Springfield, one of the state's most economically disadvantaged school districts, generally receives near the maximum percentage.

Most often, after approval, USAC and a school simply disburse their respective shares of the cost directly to the service provider.  Sometimes, however, schools elect an alternative payment method, referred to as "Billed Entity Applicant Reimbursement" (BEAR), especially if they want a project completed

quickly. Springfield chose the BEAR option for the two contracts at issue here. Under the BEAR method, a school (the "Billed Entity Applicant") pays the full cost to a service provider up front, receives from USAC a funding commitment letter for the E-Rate program's share of the cost, and then submits a form to USAC to receive reimbursement.

USAC makes its payments from the USF in the form of either a check or, if the service provider so chooses and owes charges to the USF, a credit against those charges. See 47 U.S.C. § 254(h)(1)(B)(i)-(ii); 47 C.F.R. § 54.515. USAC says that it lacks the authority to pay a school directly, because the Telecom Act and its regulations allow payments from the USF only to service providers. See 47 U.S.C. § 254(e) ("[O]nly an eligible telecommunications carrier . . . shall be eligible to receive specific Federal universal service support"); id. § 254(h)(1)(B) (authorizing E-Rate payments for "telecommunications carriers"). Thus the service provider, who has already been paid, must receive the funds under the BEAR method and pass them through to the school. As part of the BEAR application, an authorized representative of the service provider is required to sign an "acknowledgment" that:

> [T]he service provider must remit the discount amount authorized by [USAC] to the Billed Entity Applicant who prepared and submitted this [form] as soon as possible after [USAC]'s notification to the service provider of the amount of the approved discounts . . . but in no

-6-

> event later than 10 calendar days after the receipt of the reimbursement payment . . . .
>
> The service provider must remit payment of the approved discount amount to the Billed Entity Applicant prior to tendering or making use of the payment issued by [USAC] to the service provider . . . .

USAC's handbook for service providers is even more explicit: "The service provider functions merely as a vehicle to deliver the reimbursement back to the applicant. Failure to provide the reimbursement in a timely fashion may result in the Service Provider facing enforcement action." USAC Service Provider Manual, supra, ch. 9.[1] Springfield says it normally received reimbursements within a few days after USAC paid them to the service provider.

LAN Tamers completed a number of projects for Springfield, two of which are pertinent. In 1999, LAN Tamers and Springfield entered into a $1,096,180.28 contract for LAN Tamers to install a high-speed data network at Central High School. In 2001, they entered into a separate one-year contract for LAN Tamers to provide network maintenance services at four Springfield schools for $134,220. LAN Tamers completed both jobs satisfactorily.

---

[1] We have found nothing further as to what "enforcement action" means, and whether it encompasses, for example, a prosecution for theft of the money. Cf. United States v. McKay, 274 F.3d 755, 759 (2d Cir. 2001) (affirming conviction under 18 U.S.C. § 641 (2000) for embezzling "money . . . of the United States" where defendant improperly collected federally funded rent subsidy from local housing authority).

Springfield paid in full for the Central High School project by January 2000, and for the maintenance contract by January 2002.

USAC initially found the Central High School project ineligible for E-Rate funding, but Springfield appealed this decision to the FCC and prevailed in March 2001. By early 2002, the contracts were fully performed by both parties and Springfield had received funding commitment letters from USAC stating that the E-Rate program would reimburse 87% of each contract's cost. These two reimbursements total $1,070,056.74. Springfield submitted the required BEAR paperwork to USAC on April 17, 2002. On each form, LAN Tamers signed the acknowledgment quoted above.

A month later, on May 20, 2002, LAN Tamers filed a voluntary Chapter 11 bankruptcy petition. Upon learning of this filing, USAC withheld payment of the reimbursements, which were to have been made to LAN Tamers by check. At proceedings brought by creditors, LAN Tamers mentioned the reimbursements and said the monies were not its property and that it acted merely as a pass-through. The creditors claimed the proceeds. The City of Springfield appeared and asserted the reimbursements were its property. The bankruptcy court opined that Springfield's claim was really a claim to title and to recover an asset and so it should be

asserted in an adversary proceeding.  <u>See</u> Fed. R. Bankr. P. 7001(2).[2]

On June 4, 2002, Springfield filed an adversary proceeding laying claim to the reimbursements.  The suit named as defendants LAN Tamers, its principal creditors, and USAC.  One creditor, the Bank of Western Massachusetts, counterclaimed, arguing that its secured interest in all receivables of LAN Tamers extended to the reimbursements.  The Official Unsecured Creditors' Committee also argued against Springfield's position and was deemed a party to the proceeding.  LAN Tamers supported Springfield's claim.  USAC also argued that the reimbursements belonged to Springfield rather than LAN Tamers, but differed as to exactly what power the bankruptcy court had over USAC to order it to take action.  Presumably, with the blessing of the bankruptcy court's determination that the funds belong to Springfield, USAC intends to make a check payable to LAN Tamers for the funds to be paid out to Springfield.[3]  The bankruptcy court took testimony in the adversary proceeding on June 13, 2002, and heard post-trial oral argument on

---

[2]     No party disagrees that this is the appropriate vehicle to sort through the claim.

[3]     Springfield also asked the bankruptcy court to order USAC to remit the reimbursements within a certain time.  The court concluded it had no jurisdiction to do so, <u>City of Springfield</u> v. <u>LAN Tamers, Inc.</u> (<u>In re LAN Tamers, Inc.</u>), 281 B.R. 782, 797-98 (Bankr. D. Mass. 2002), and the issue is not before us.  USAC has filed an amicus brief in support of Springfield in this appeal.

June 26.  It also received pre-trial and post-trial briefing from the parties.

The bankruptcy court issued a comprehensive written decision in the adversary proceeding on August 16, 2002.  City of Springfield v. LAN Tamers, Inc. (In re LAN Tamers, Inc.), 281 B.R. 782 (Bankr. D. Mass. 2002).  It determined that the reimbursements were not the property of the estate, but were held by LAN Tamers in either a resulting trust or a constructive trust for the benefit of Springfield.  Id. at 792, 796-97.  The district court affirmed this decision in a one-page order on September 26.

In October 2002, the bankruptcy court converted LAN Tamers' petition from Chapter 11 to Chapter 7 and appointed David W. Ostrander as trustee of the bankruptcy estate.  The trustee replaced the creditors' committee as the appellant before this court.  He appeals the exclusion of the reimbursements from the property of the estate.

II.

The only issue here, whether the reimbursements are the property of the estate, is purely one of law.  Normally, such issues are reviewed de novo.  See Lentz v. Spadoni (In re Spadoni), 316 F.3d 56, 58 (1st Cir. 2003); Adams v. Coveney, 162 F.3d 23, 25 (1st Cir. 1998).  Springfield argues for a more deferential standard, citing a case concerning a bankruptcy court's award of fees, Prebor v. Collins (In re I Don't Trust), 143 F.3d 1, 3 (1st

-10-

Cir. 1998) (per curiam). That case is inapposite, because it invoked discretionary and fact-based judgments made by the bankruptcy judge. Id.; see Casco N. Bank, N.A. v. DN Assocs. (In re DN Assocs.), 3 F.3d 512, 515 (1st Cir. 1993). Here, there is plenary review of an unalloyed legal question. We have jurisdiction over the appeal because the ruling is a final disposition of Springfield's adversary action.

Section 541 of the Bankruptcy Code defines the property of the estate. See 11 U.S.C. § 541 (2000). The statutory language evinces congressional intent to include a broad range of property. See United States v. Whiting Pools, Inc., 462 U.S. 198, 204-05 (1983). It begins, in § 541(a), by including "all legal or equitable interests of the debtor in property." 11 U.S.C. § 541(a)(1). The remainder of § 541, however, enumerates statutory exclusions from this broad definition. Property covered by these provisions is "excluded" from the estate, rather than being "exempted" under other portions of the Code. This is an important distinction. See Traina v. Sewell (In re Sewell), 180 F.3d 707, 710 (5th Cir. 1999) (differentiating "exclusions" from "exemptions"); Ostrander v. Lalchandani (In re Lalchandani), 279 B.R. 880, 882 n.3 (B.A.P. 1st Cir. 2002) ("[P]roperty must first be property of the estate before it can be exempted.").

Two exclusions are arguably relevant here. One such exclusion, § 541(c)(2), removes inalienable interests in trusts,

-11-

typically spendthrift trusts or pension plans, from the estate. The bankruptcy court rested its holding on another basis for exclusion, which states:

> Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of the estate . . . only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

11 U.S.C. § 541(d).

The trustee argues that the reimbursements are accounts receivable of LAN Tamers, covered by the broad definition of the property of the estate, and that Springfield is an ordinary unsecured creditor of LAN Tamers, entitled only to a pro rata distribution for its claim on an unpaid contractual debt. Springfield, pointing to the bankruptcy court decision and the language of the § 541(d) exclusion, responds that LAN Tamers never had any equitable interest in the reimbursements and was simply a conduit for them. There is no claim that Springfield did not meet all the requirements to get the funding; USAC, in whose coffers the funds now reside, argues that the money should go to Springfield. Cf. Buchanan v. Alexander, 45 U.S. (4 How.) 20 (1846) (navy purser argues that seamen's wages cannot be attached by their creditors).

The plain text of § 541(d) excludes property from the estate where the bankrupt entity is only a delivery vehicle and lacks any equitable interest in the property it delivers. Identical language found in both the House and Senate reports that

-12-

accompanied passage of the Bankruptcy Code strongly reinforces this plain reading. See United States v. Yellin (In re Weinstein), 272 F.3d 39, 43, 45-46 (1st Cir. 2001) (further supporting plain-text interpretation of Bankruptcy Code through legislative history). While noting that the overall scope of § 541 is broad, the reports continue:

> Situations occasionally arise where property ostensibly belonging to the debtor will actually not be property of the debtor, but will be held in trust for another. For example, if the debtor has incurred medical bills that were covered by insurance, and the insurance company had sent payment of the bills to the debtor before the debtor had paid the bill for which the payment was reimbursement, the payment would actually be held in a constructive trust for the person to whom the bill was owed.

S. Rep. No. 95-989 (1978), at 82, reprinted in 1978 U.S.C.C.A.N. 5787, 5868; H.R. Rep. No. 95-595 (1978), at 368, reprinted in 1978 U.S.C.C.A.N. 5963, 6324. In this congressional hypothetical, property is excluded from the estate where the debtor merely receives property in order to deliver it to its intended recipient without any control or ownership over it.

The task, then, is to characterize the reimbursements properly. To determine the nature of LAN Tamers' interest, we look to the nature of the federal program from which that interest arises. At least two circuits have faced analogous problems under § 541(d). In one of these cases, the Seventh Circuit aptly framed the issue:

> The answer depends on the terms under which the grants were made. Did they constitute [the debtor] a trustee, custodian, or other intermediary, who lacks beneficial title and is merely an agent for the disbursal of funds belonging to another? If so, the funds . . . were not assets of the bankruptcy estate. Or were the grants more like payment under a contract . . . ?

In re Joliet-Will County Cmty. Action Agency, 847 F.2d 430, 432 (7th Cir. 1988) (Posner, J.) (citations omitted). Joliet-Will involved efforts by a federal agency to claim the unexpended balance of federal grant funds and property bought with grant funds from the estate of a bankrupt private nonprofit community service agency, and thus to prevent distribution of this property to creditors. The court looked at the nature of the federal government's interest in the property, expressed through the regulations and the nature of the grantor-grantee relationship. Id. at 432. Joliet-Will expressly noted that this federal interest does not preempt the Code -- a recipient of federal money can declare bankruptcy -- but it may affect the issue of who owns the property. Id. at 433.

The Third Circuit, in deciding In re Columbia Gas Systems, Inc., 997 F.2d 1039 (3d Cir. 1993), held that refunds created and mandated pursuant to federal law by a federal agency, the Federal Energy Regulatory Commission (FERC), and held by a bankrupt natural gas pipeline company, were not the property of the estate under § 541(d). Id. at 1061 (debtor "acts as a receiving and transmitting agent, or a conduit, for money upstream suppliers

-14-

owe to overcharged consumers") (quotation omitted). As such, the funds could not be reached by creditors of the bankrupt entity. Analyzing the problem as one of federal law, Columbia Gas held that the bankruptcy court should give permission to the debtor to pay refunds that it had collected from upstream suppliers to the appropriate customers. Id. at 1064. Using trust and beneficiary concepts as a matter of federal common law, the court considered the facts that the refunds were created by order of a federal agency, private parties could not alter the refund orders, the refunds implemented a central objective of the federal legislation, and the refunds should not be subject to the inconsistent results that the vagaries of state law would impose. Id. at 1055. Columbia Gas likewise excluded surcharges the debtor had collected from customers to fund industry research under FERC's direction. Id. at 1062; see also Westmoreland Human Opportunities, Inc. v. Walsh, 246 F.3d 233, 243-46 (3d Cir. 2001) (rights to debtor grantee's continuing contract relationship with government are not property of the estate); In re United Milk Prods. Co., 261 F. Supp. 766 (N.D. Ill. 1966) (funds collected by debtor under federal milk marketing orders, and owed to milk producers, are not property of the estate in pre-Code case); cf. Yonkers Bd. of Educ. v. Richmond Children's Ctr., 58 B.R. 980, 981-82 (S.D.N.Y. 1986) (funds from state education department paid to debtor but designated as "pass-

-15-

through" payment for school district are not property of the estate).

These cases share several common modes of analysis which we apply here. First, we look to the role that the debtor was intended to play. In the words of USAC's guidance to service providers, LAN Tamers "function[ed] merely as a vehicle to deliver the reimbursement back to the applicant." Courts have classified debtors as mere delivery vehicles even when the nature of the "pass-through" under a government program is less obvious than it is here.[4] See Joliet-Will, 847 F.2d at 432; Connecticut v. Novak (In re Cmty. Assocs., Inc.), 173 B.R. 824, 830 (D. Conn. 1994) (vans purchased with state-administered federal grant for transport of elderly and disabled are not property of the estate). Joliet-Will emphasized that the terms of the grant rendered the grantee "in effect an agent to carry out specified tasks rather than a

---

[4] Some courts have excluded property from the estate on the basis that the debtor was a mere delivery vehicle without any government interest directly at stake. See, e.g., T & B Scottdale Contractors, Inc. v. United States, 866 F.2d 1372, 1376 (11th Cir. 1989) (bank account maintained by primary contractor contained funds from subcontractor to pay its materialmen; funds not part of subcontractor's bankruptcy estate because held solely for benefit of materialmen); Branch v. Hill, Holliday, Connors, Cosmopolous, Inc. (In re Bank of New Engl. Corp.), 165 B.R. 972, 978 (Bankr. D. Mass. 1994) (debtor transmitted payments from its subsidiaries to an advertising agency; this was "straight pass-through" with "no profit element" for debtor and therefore not property of its estate); Shipley Co. v. Darr (In re Tap, Inc.), 52 B.R. 271, 276 (Bankr. D. Mass. 1985) (debtor payroll company's "only function was to transmit the funds entrusted to it promptly" so that funds are not property of its estate). We need not consider such non-governmental situations in this appeal.

-16-

borrower, or an entrepreneur using invested funds." 847 F.2d at 432. The restrictive rules and intensive oversight rendered the grantee's ownership "nominal." Id.; see also Cmty. Assocs., 173 B.R. at 828-29 (applying similar analysis to restrictive grant agreement). There is little doubt in this case that the regulatory structure of the E-Rate program reduced LAN Tamers to the status of a mere delivery vehicle. LAN Tamers signed an acknowledgment stating as much and foregoing any beneficial interest in the funds. USAC's guidance reiterates the point forcefully.

Second, we look to the degree and intensity of regulatory control over the property in question. See, e.g., Westmoreland, 246 F.3d at 244-46 (looking to agency's "pervasive and rigorous" administration of grant); Joliet-Will, 847 F.2d at 432 (noting that federal agency placed "minute controls on the use of the funds" by debtor grantee). As stringent as the supervision was in cases such as Joliet-Will, the debtor there enjoyed at least some autonomy in the use of the property at issue. Not so here. Under the BEAR payment method, LAN Tamers has absolutely no freedom to do anything with the reimbursements except forward them to Springfield within ten days. LAN Tamers was explicitly barred from "tendering or making use of" the payment from USAC before Springfield was reimbursed. In addition, other aspects of the E-Rate program, including the registration of service providers and the multi-

layered approval process for projects, display a comparable or greater degree of regulatory control.

Next, we focus on the extent to which recognizing a greater ownership interest -- and thereby diverting the property in question to the creditors -- would thwart the overall purpose of the regulatory scheme. See, e.g., Columbia Gas, 997 F.2d at 1055 ("[T]he refunds arise directly from federal law and implement the central objective of the [Natural Gas Act]."); Yonkers, 58 B.R. at 983 (purpose of reimbursement structure was to provide free public education to mentally disabled children). In part, the amount of oversight is a proxy for this consideration. See Westmoreland, 246 F.3d at 244. But even without reference to the detailed BEAR procedures, it is clear that Congress intended money from the USF to pay only for certain very specific activities. See 47 U.S.C. § 254(e) (USF funds shall be used "only for the provision, maintenance, and upgrading of facilities and services for which the support is intended"). LAN Tamers has already been paid for the eligible services it provided; allowing USF funds to pay its other debts would violate this congressional mandate. See Buchanan, 45 U.S. at 20-21 ("The funds of the government are specifically appropriated to certain national objects, and if such appropriations may be diverted and defeated by state process or otherwise, the functions of the government may be suspended."); Joliet-Will, 847 F.2d at 432 ("Congress is traditionally chary" of

-18-

allowing funds of government programs to be diverted from their stated purposes).

Finally, we note that this conclusion also prevents the creditors from receiving a windfall of double payment for the work LAN Tamers completed in Springfield's schools. If LAN Tamers had not filed for bankruptcy, it could hardly sue USAC in its own right to be paid again, having received full payment for its services from Springfield long before. Once USAC issued the check to LAN Tamers, the company could not have diverted the funds to its creditors or to other purposes without "facing enforcement action." At most, LAN Tamers arguably would hold bare legal title to the reimbursements for a short time.[5] It is a fundamental principle of bankruptcy law "that the estate can only succeed to the same property interest that the debtor possesses, and cannot achieve a greater interest." 5 L.P. King et al., Collier on Bankruptcy ¶ 541.01, at p. 541-8 (15th ed. 2003) (discussing § 541(d)). A conclusion that the reimbursements should be distributed to the creditors would flout this basic premise. It would provide a windfall to the creditors at the expense of Springfield's public schools and its students, contrary to the dictates of the statutory and regulatory text underlying the E-Rate program.

---

[5] For purposes of this opinion, we need not consider whether the bankruptcy court was correct in determining that LAN Tamers did hold legal title to the reimbursements, despite the fact that USAC has never sent the check. See LAN Tamers, 281 B.R. at 792.

III.

The trustee seeks to undermine this conclusion in a variety of ways. He advances different characterizations of many of the cases cited above, but the factual distinctions he makes are immaterial to the legal conclusions we draw from the cases.

The trustee devotes most of his energy to supporting a very narrow interpretation of § 541(d). He argues that it applies solely to trusts that would be recognized under state law, in this case Massachusetts law. He further argues that the conditions of Massachusetts trust law are not satisfied here. We need not determine if the second contention is correct, because we reject the first. There is no basis for a per se rule limiting § 541(d) to state law trusts under all circumstances.

The Supreme Court unanimously rejected such a "state law only" interpretation in Patterson v. Shumate, 504 U.S. 753 (1992). That case concerned the exclusion in § 541(c)(2): "A restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable in a case under [the Bankruptcy Code]." A beneficiary of a pension plan that was covered by the antialienation provision of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1056(d)(1) (1988), claimed that his interest in the plan was excluded from his bankruptcy estate because ERISA served as "applicable nonbankruptcy law" restricting its transfer. The

Patterson Court rejected an argument that the phrase applies only to state law, and not ERISA, finding that interpretation contrary to a "natural reading of the provision." 504 U.S. at 758; see Lalchandani, 279 B.R. at 885-86 (applying ERISA to § 541(c)(2) case concerning dependents of beneficiaries).

The Court also noted that, when Congress intended for bankruptcy questions to be answered only by reference to state law, it so specified. Patterson, 504 U.S. at 758 (citing examples). For example, the Code explicitly incorporates applicable state law in defining certain exemptions. See 11 U.S.C. § 522(b); Howe v. Richardson, 193 F.3d 60, 61 (1st Cir. 1999) (applying Rhode Island law to exemption under § 522(b)(2)(A)). In the absence of any language specifically incorporating state law in the exclusions, the "natural reading" of § 541(d), like the Patterson Court's reading of § 541(c)(2), cuts against the trustee's proposed construction that it incorporates and is restricted by state law in all situations.

It is true that state law often provides the applicable rules for bankruptcy determinations in the absence of other imperatives. As the Supreme Court has summarized it, "Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently [in bankruptcy law]." Butner v. United States, 440 U.S. 48, 55 (1979) (emphasis

-21-

added); see Barnhill v. Johnson, 503 U.S. 393, 398 (1992) (citing Butner). Likewise, a recent bankruptcy decision in this court noted that a federal court "will often simply incorporate the law of the appropriate state if there is no relevant federal interest to justify a distinct federal rule." United States v. Fleet Bank of Mass. (In re Calore Express Co.), 288 F.3d 22, 44 (1st Cir. 2002) (emphasis added); see also Conn. Gen. Life Ins. Co. v. Universal Ins. Co., 838 F.2d 612, 618 (1st Cir. 1988) (state law "usually" the determinant of property interests). In short, "Section 541 eliminates exclusive reliance on state law in determining what constitutes property of the estate but recognizes the traditional role of the states in creating and defining the underlying property interests and commercial arrangements to which bankruptcy law applies." Branch v. Hill, Holliday, Connors, Cosmopolous, Inc. (In re Bank of New Engl. Corp.), 165 B.R. 972, 977 (Bankr. D. Mass. 1994) (quotation omitted).

The qualifying clauses in these decisions cannot be ignored. Where there are significant federal interests involved, the default rule of applying state standards to bankruptcy determinations may yield.[6] Here, the statutory and regulatory framework for the E-Rate program, established under the Telecom Act, provides a federal definition of the property interests

_____

[6] We need not decide precisely when state law would or would not apply. We simply conclude that this situation involves sufficiently significant federal interests.

-22-

involved in this case.  That definition takes account of the federal government's aspiration, expressed in the Telecom Act and promoted by the activities of the FCC and USAC, that "[e]lementary and secondary schools and classrooms . . . should have access to advanced telecommunications services."  47 U.S.C. § 254(b)(6).  As such, it is the definition that we apply.  See Calore Express, 288 F.3d at 43-44 (choice of standard guided by protection of strong federal interests).

Just as the language of § 541(d) does not invariably incorporate state law, it is not always limited to trusts either. To be sure, since the separation of legal and equitable interests is characteristic of a trust, there will be overlap.  In some of the cases discussed above, courts classified the excluded property as the corpus of a trust of some kind.  E.g., Columbia Gas, 997 F.2d at 1059-60; Yonkers, 58 B.R. at 983.  The bankruptcy court here did so as well.  LAN Tamers, 281 B.R. at 792.  And Congress referred to a "constructive trust" in the insurance hypothetical quoted earlier.

This usage may prove confusing, however, because these supposed trusts might lack characteristics of trusts recognized for other purposes under state law.  We think it better to avoid the language of trusts and rest our holding more simply on the fact that LAN Tamers, as a mere delivery vehicle, lacked an equitable

interest in the reimbursements under the federal program.[7]  See R.J. Keach, The Continued Unsettled State of Constructive Trusts in Bankruptcy, 103 Com. L.J. 411, 446, 449 n.172 (1998) (distinguishing "true conduit" cases from constructive trust cases); cf. Joliet-Will, 847 F.2d at 433 (criticizing characterization of government's interest in debtor's grant funds as "equitable lien" for similar reasons).

The trustee also argues that the Supreme Court's recent decision in FCC v. NextWave Personal Communications, Inc., 123 S. Ct. 832 (2003), requires a different outcome.  In NextWave, the debtor had purchased broadband spectrum licenses in an FCC auction, and arranged to pay for them in installments. When the debtor fell behind in its payments and filed for bankruptcy, the FCC tried to revoke the licenses, but the Court held that it could not.  The licenses remained property of the estate.

There are two enormous differences between NextWave and this case.  First, FCC licenses have many qualities of property in which the licensee holds beneficial interest, sweeping them out of the § 541(d) exclusion and into the broad overall definition of property of the estate.  See Ramsay v. Dowden, (In re Cent. Ark.

---

[7]      In addition, the use of constructive trusts as the basis for exclusions under § 541 has been criticized for reasons unrelated to the situation of the true delivery vehicle.  See generally XL/Datacomp, Inc. v. Wilson (In re Omegas Group, Inc.), 16 F.3d 1443 (6th Cir. 1994); E.L. Sherwin, Constructive Trusts in Bankruptcy, 1989 U. Ill. L. Rev. 297.

Broad. Co.), 68 F.3d 213, 214-15 (8th Cir. 1995) (per curiam). The licensee secures the right to engage in communications activities and keep the resulting profit for itself -- rather than serving solely as a vehicle delivering benefits to another -- and does so under less pervasive regulatory supervision. See Westmoreland, 246 F.3d at 253-54 (distinguishing broadcast licenses from contract rights under a grant).

A second distinction between this case and NextWave is that NextWave relied heavily on specific language in the Bankruptcy Code barring the government from revoking a license on the basis of a debtor's nonpayment. See 11 U.S.C. § 525(a). The Court rejected the FCC's argument that its regulatory authority trumped this prohibition. NextWave, 123 S. Ct. at 838-40. As such, it invalidated the purported revocation as "not in accordance with law" under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (2000). See NextWave, 123 S. Ct. at 838. Here, in contrast, the trustee points to no similar provision of the Code that applies to the reimbursements and stands in opposition to the federal rules derived from the E-Rate program's regulatory scheme.

Finally, throughout his briefs the trustee emphasizes the importance in bankruptcy law of equal footing for similarly placed creditors. The argument assumes that Springfield is indeed a creditor similar to the others. This bankruptcy policy is not implicated, however, when the property in question is not

-25-

legitimately available to creditors in the first place.  See Begier v. IRS, 496 U.S. 53, 58 (1990) (policy behind avoidance irrelevant when property is not part of the estate); United Milk, 261 F. Supp. at 768 ("[U]nsecured creditors should not be permitted to share in monies . . . which [the debtor] would not be permitted to retain for its own use.").  The true harm to creditors is minimal here anyway, because the legal and regulatory impediment to using the reimbursements for other purposes makes bare legal title to them an asset of almost no value.  See Westmoreland, 246 F.3d at 244 (restrictions on housing grants so limit their transferability that grantee's interest is "essentially valueless").  LAN Tamers served only as a delivery vehicle for federally regulated reimbursements derived from the USF, not as an owner of those funds (or of the right to receive them).  The reimbursements were never part of the bankruptcy estate, so creditors never had a claim to them.

IV.

For the reasons stated in this opinion, the ruling of the district court is **affirmed**.