**In re WEST CENTRAL HOUSING DEVELOPMENT ORGANIZATION, Debtor.**

No. 04–23758 HRT.

United States Bankruptcy Court, D. Colorado.

Dec. 21, 2005.

Christine M. Arguello, Davis Graham & Stubbs, Denver, CO, for the State of Colorado.

Charles Greenhouse, Murray Franke Greenhouse List & Lippit, LLP, Denver, CO, for High Desert State Bank.

William S. Silverman, Silverman & Riley, Denver, CO, for Paonia Land and Cattle LLC.

David Palmer, Chapter 7 Trustee, pro se.

### ORDER GRANTING MOTION FOR ORDER DIRECTING TRUSTEE TO RELEASE ALL CLAIMS TO REVOLVING LOAN FUND ACCOUNT AND TO DELIVER POSSESSION THEREOF TO THE STATE OF COLORADO

HOWARD R. TALLMAN, Bankruptcy Judge.

This case comes before the Court on Colorado's *Motion for Order Directing Trustee to Release all Claims to Revolving Loan Fund Account and to Deliver Possession Thereof to the State of Colorado* (docket # 46) [the "Motion"]; High Desert State Bank's *Response to Motion for Order Directing Trustee to Release all Claims to Revolving Loan Fund Account and Deliver Possession Thereof to the State of Colorado* (docket # 52); and *Paonia Land and Cattle LLC's Objection to Motion for Order Directing Trustee to Release all Claims and* [sic] *Revolving Loan Fund Account and to Deliver Possession Thereof to State of Colorado* (docket # 54).

The matter was tried to the Court on May 27, 2005, and on July 11, 2005. At the close of the evidence, the Court requested that the parties submit their closing arguments in writing. The State of Colorado [the "State"] filed its closing argument on July 25, 2005; Paonia Land and Cattle, LLC, ["Paonia"] and High Desert State Bank ["High Desert"] submitted their joint closing argument on August 5, 2005; and the State submitted its final closing argument on August 15, 2005. The Court has considered the pleadings filed in the matter, the substantial volume of evidence submitted at trial, and the closing arguments of the parties, and is ready to rule.

### I. FACTS

West Central Housing Development Organization ["WCHDO"] was a non-profit organization which served a six county region from its headquarters located in Delta, Colorado. It provided down payment loans and low interest residential rehabilitation loans directly to individuals. It also made loans for the development of low income housing projects. WCHDO filed its petition under chapter 7 on June 25, 2004. The bankruptcy filing followed WCHDO's discovery that its executive director had allegedly embezzled funds from the organization.

The Motion seeks the release of any claim the Trustee may assert to certain funds and promissory notes in the Trus-

tee's possession and to turn those assets over to the State. The assets at issue consist of bank account balances of $460,360.40; and note balances of $1,474,-558.07 [1] [the "Revolving Loan Assets"]. The Revolving Loan Assets are derived from block grant monies given to the State by the federal government for the purpose of supporting housing rehabilitation and home ownership. In turn, the State distributes those funds to local governments, which contract with housing organizations like WCHDO to administer the programs. The Revolving Loan Assets also includes some matching funds raised by WCHDO.

In support of its Motion, the State argues that those Revolving Loan Assets, in the possession and control of WCHDO, were held in trust solely for the purposes set out in the grant documents and by statute. Accordingly, the State argues that WCHDO had no equitable interest in the Revolving Loan Assets and they never became property of the bankruptcy estate under § 541. [2]

High Desert and Paonia [collectively, the "Respondents"] resist the Motion. They argue that the State does not have standing to assert an interest in the Revolving Loan Assets because the State is not the beneficiary for whom those assets are held. The Respondents further argue that any interest that the State may have in the Revolving Loan Assets constitutes an interest in real property that the Trustee may avoid with "strong arm" powers under § 544(a)(3). Finally, the Respondents argue that the State has failed to meet its burden to demonstrate its interest and entitlement to the Revolving Loan Assets.

## II. DISCUSSION

### A. Standing

The State has standing to pursue this action. The ultimate beneficiaries of the grant monies that are at issue in this case are those citizens of Colorado who are eligible to receive loans from WCHDO under these programs. The State need not claim an ownership interest in the Revolving Loan Assets in order to have standing to pursue this turnover action. The doctrine of *parens patriae* allows the State to take action to protect the rights of all or a portion of its citizens. It is enough that it has a *quasi-sovereign* interest in protecting the rights of that group of citizens in the six county area served by WCHDO who may qualify for housing assistance. In addition, the State has a broader interest in insuring that money it has received, and which has been earmarked to provide housing assistance to its citizens, remains available for that purpose. The State's role as protector of the rights of those of its citizens who are in need of the housing assistance provided by the programs that WCHDO administered makes it a real party in interest and the proper party to pursue this action. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 603, 102 S.Ct. 3260, 3266–67, 73 L.Ed.2d 995 (1982).

### B. Title 11 U.S.C. § 544(a)(3) is Inapplicable

Respondents argue that the Trustee may use his strong-arm powers under § 544(a)(3) to avoid the State's interest in

---

1. These amounts reflect cash and note receivable balances as of August 31, 2005, per the *Report to the Court Re Financial Matters* (docket # 111) filed by the Trustee on September 15, 2005. These figures will change as loan payments are received by the estate.

2. Unless otherwise noted, statutory references are to the Bankruptcy Code, 11 U.S.C. § 101 et seq.

the Revolving Loan Assets because that interest is an interest in real property that has not been properly perfected. Section 544(a)(3) provides that

> The trustee shall have, as of the commencement of the case, ... the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—*a bona fide purchaser of real property*, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists.

11 U.S.C. § 544(a)(3) (emphasis added).

The Revolving Loan Assets consist of cash as well as notes and deeds of trust securing those notes. On its face, the Respondents' argument fails as to the cash. The State's interest in the cash component of the Revolving Loan Assets is certainly not real property.

But the Revolving Loan Assets do include promissory notes that are secured by deeds of trust in pieces of real property. With respect to this component of the Revolving Loan Assets, the Respondents' argument also fails because the State's interest in those notes and deeds of trust is a personal property interest rather than a real property interest.

■ "The extent of the trustee's rights as a bona fide purchaser of real property ... is measured by the substantive law of the state governing the property in question." *Anderson v. Conine (In re Robertson)*, 203 F.3d 855, 864 (5th Cir. 2000). By statute, Colorado has adopted the lien theory of mortgages. Colo. Rev. Stat. § 38–35–117. Under a lien theory, the granting of a mortgage in real property does not convey an interest in that real

property, but merely constitutes a lien on the property. *Id; Columbus Investments v. Lewis,* 48 P.3d 1222, 1225 (Colo.2002) (en banc) ("A mortgage is not a conveyance of a real property interest ...."); *Crown Life Ins. Co. v. Haag Ltd. P'ship,* 929 P.2d 42, 45 (Colo.Ct.App.1996) ("[T]he question presented is whether a promissory note secured by an incumbrance [encumbrance] on realty creates an interest in that realty. We conclude that it does not."). Because § 544(a)(3) is applicable only to interests in real property, and because the State's interest in the Revolving Loan Assets is purely a personal property interest, the Trustee cannot use his strong-arm powers under § 544(a)(3) to avoid the State's interest in any part of the Revolving Loan Assets.

## C. The Revolving Loan Assets are Not Property of the WCHDO Bankruptcy Estate

■ The Court agrees with the State that the pivotal issue in this matter is whether or not WCHDO held the beneficial interest, as well as legal title, to the Revolving Loan Assets at the time the bankruptcy petition was filed. The Court's review of the several grant contracts and intergovernmental agency agreements admitted into evidence reveals that all of those agreements recite that they are subject to state and federal regulations governing the granting and use of the subject funds. The restrictions contained in those regulations establish WCHDO's role as holding only bare legal title to the Revolving Loan Assets in order to manage those assets for the benefit of individuals who were intended to receive assistance through the programs that WCHDO administered. WCHDO did not hold a beneficial interest in the Revolving Loan Funds. Consequently, under § 544(d), the Revolving Loan Assets only

became bankruptcy estate property to the extent of the Debtor's bare legal title. No equitable interest in the Revolving Loan Assets ever became an asset of the bankruptcy estate. *See U.S. v. Whiting Pools, Inc.,* 462 U.S. 198, 205 n. 10, 103 S.Ct. 2309, 2314 n. 10, 76 L.Ed.2d 515 (1983) ("We do not now decide the outer boundaries of the bankruptcy estate. We note only that Congress plainly excluded property of others held by the debtor in trust at the time of the filing of the petition.").

### 1) *Funds Acquired Through the CDBG Program*

WCHDO received funds through the Community Development Block Grant ["CDBG"] program established by the Housing and Community Development Act of 1974 and administered by the U.S. Department of Housing and Urban Development ["HUD"]. The Court has reviewed the CDBG grant contracts entered into evidence. Those contracts are executed between the State and Delta County. Delta County is the "contractor" as that term is used in the contract documents. Delta County and WCHDO entered into intergovernmental agreements [Exhibits A–13 and A–14] stating that Delta County would contract with WCHDO to carry out its responsibilities under the CDBG grants. Thus, WCHDO is a "subcontractor" or "subrecipient" of the funds granted to Delta County under the grant agreements. The CDBG grant agreements contain provisions stating generally that contractors and subcontractors will comply with applicable state and federal statutes and regulations. For example, Exhibit A–7, one of the CDBG grant contracts, contains the following language at ¶ 23:

> At all times during the performance of this Contract, the Contractor and any subcontractors shall strictly adhere to all applicable Federal and State laws, orders, and all applicable standards, reg-

ulations, interpretations or guidelines issued pursuant thereto.

The four pages of the grant contract, which follow that language, list some of the applicable federal laws. Similar language appears in the other CDBG program contracts admitted into evidence. Thus WCHDO is bound by its express contract with Delta County to carry out Delta County's responsibilities under the CDBG grant contracts. Those contracts specify that WCHDO, as a subcontractor of Delta County, is bound by all applicable federal and state statutes and regulations.

One such applicable regulation is 24 CFR § 84.37. That regulation is applicable to federal grant programs funded by HUD. 24 CRF § 84.1. It covers subrecipients of grant funds, such as WCHDO, as well as the direct recipients. 24 CFR § 84.5. The regulation explicitly provides that "[r]eal property, equipment, intangible property and debt instruments that are acquired or improved with Federal funds shall be held in trust by the recipient as trustee for the beneficiaries of the project or program under which the property was acquired or improved." Therefore, it creates an explicit trust relationship between grant recipients, such as WCHDO, and the beneficiaries of the CDBG grant programs.

### 2) *Funds Acquired Through the HOME Program*

In addition to funds derived from CDBG programs, the Revolving Loan Assets also include funds derived from a program under the 1990 National Affordable Housing Act. That program was administered by WCHDO and is known as the HOME program. Delta County is the "Contractor" under the grant contracts associated with the HOME program. The grant contracts admitted into evidence, which were en-

tered into under the HOME program, contain reference to the contractor's duty to adhere to all federal and state laws and regulations. As an example of the language appearing in the HOME program contracts, Exhibit A–3 at ¶ 24 reads as follows:

At all times during the performance of this contract, the Contractor and any subcontractors shall strictly adhere to all applicable federal and State laws, orders, and all applicable standards, interpretations or guidelines issued pursuant thereto.

The specific regulations referenced and incorporated into grant agreements relating to the 1990 National Affordable Housing Act ["HOME"] grants differed somewhat, depending upon when they were entered into.

Earlier grant agreements make reference to and incorporate 24 CFR § 92.2. That regulation, in turn, refers to 24 CFR § 84.21, which requires grant recipients to assure that grant funds are used solely for the purposes authorized in the grant agreement. 24 CFR § 84.21(b)(3). While the term "trust" is not used in 24 CFR § 84.21, the restrictions on a grant recipient's use of the grant funds establish that the grant recipient occupies the role of a trustee of the grant money it receives.

Regulation number 24 CFR § 84.37 was promulgated in 1994 [3] and is incorporated into the later grant agreements. An excerpt from that regulation is quoted above in relation to the CDBG grants. It creates the same explicit trust relationship between grant recipients and the beneficiaries of the HOME grant programs as it does in relation to the CDBG grant programs.

The State did not offer into evidence the same type of intergovernmental agreements in relation to the HOME grant contracts as it did in relation to the CDBG grants. However, Theresa Durran, a program manager for the State, testified that WCHDO occupied the status of a subgrantee or subcontractor with respect to funds received through the HOME grant. As the contractor under the grant contracts, Delta County was contractually bound to insure that WCHDO, as a subcontractor, complied with all applicable state and federal regulations.

The documents entered into evidence demonstrate a direct contractual relationship between the State and Delta County. The Court does not have before it any subcontracts entered into between Delta County and WCHDO relating to the HOME grants. Even though the grant contracts purport to bind subcontractors, WCHDO is not a signatory to those agreements, and the Court cannot find that WCHDO is bound by those agreements. Nonetheless, WCHDO's obligation to comply with the federal statutes and regulations relating to the HOME grants is not dependent upon a contractual relationship.

### 3) WCHDO was Bound by Federal Statutes and Regulations Even in the Absence of Contract Provisions

The evidence presented at hearing established that WCHDO was a recipient of funds from both the CDBG and HOME grant programs.

As noted above, one of the many federal regulations applicable to funds disbursed under the CDBG grant program reads: "[r]eal property, equipment, intangible property and debt instruments that are

---

3. Published in the Federal Register at 59 Fed. Reg. 47,010–01 (Sept. 13, 1994) (effective October 13, 1994).

acquired or improved with Federal funds shall be held in trust by the recipient as trustee for the beneficiaries of the project or program under which the property was acquired or improved." 24 CFR § 84.37. It is undisputed that the federal funds portion of the Revolving Loan Assets moved from HUD to the State to Delta County and ultimately to WCHDO. Regulation 24 CFR § 84.37 is applicable to WCHDO as a subrecipient of the federal grant funds. 24 CFR § 84.5. It establishes trust responsibilities with respect to those federal funds and the assets derived from those funds. The applicability of 24 CFR § 84.37 to WCHDO is based solely on WCHDO's status as a subrecipient of federal grant funds. While WCHDO's status may be a result of its contractual relationship with the Delta County, it is WCHDO's receipt of those funds that triggers the provisions of 24 CFR § 84.37, not the provisions appearing in WCHDO's contract with Delta County.

The same analysis applies to Revolving Loan Assets derived from HOME grants made after 1994 when 24 CFR § 84.37 was promulgated. Regulation 24 CFR § 84.21 also applies to WCHDO as a subrecipient of HUD funds under the HOME grant program. That federal regulation was applicable prior to 1994. It requires that WCHDO maintain "[e]ffective control over and accountability for all funds, property and other assets.... [and] adequately safeguard all such assets and assure they are used solely for authorized purposes." 24 CFR § 84.21(b)(3). Just as with the CDBG funds discussed above, it is WCHDO's status as a recipient of HUD funds that makes these regulations applicable to it, quite independently of any provision contained in any contract to which WCHDO is a party.

These federal regulations provide that a recipient of CDBG and HOME grant funds holds those funds in trust. The regulations have the force and effect of federal law, *Chrysler Corp. v. Brown,* 441 U.S. 281, 295–96, 99 S.Ct. 1705, 1714, 60 L.Ed.2d 208 (1979), and their provisions are binding on WCHDO as a recipient of those federal grant funds. Even in the absence of a contractual obligation to hold the federal grant funds in trust, WCHDO was bound by federal regulations to act in the role of a trustee of the federal grant funds. It held no beneficial interest in any of the Revolving Loan Assets derived from CDBG and HOME grant funds.

### 4) Commingling of Trust Funds

There was some evidence at hearing that matching funds from government agencies and funds from other contributors were deposited into the same accounts as the funds from the federal HOME and CDBG grant funds. The hearing testimony was that those funds were used for the payment of administrative expenses.

The Respondents argue, in essence, that by presenting evidence that funds from other sources were mixed with the trust funds, the Court cannot turn the Revolving Loan Assets over to the State because the Court cannot determine the precise amount of the Revolving Loan Assets that was derived from the federal grants. The Court agrees that the State's evidence is insufficient for the Court to perform a precise tracing of funds and determine a breakdown of the Revolving Loan Assets that identifies those assets derived solely from federal grant money and those whose origin may include funds from state matching funds or from private donors.

But, the issue in this case focuses on WCHDO's beneficial interest in the Revolving Loan Assets. With respect to those Revolving Loan Assets that may have been derived from money contributed from other governmental agencies and

from private contributors, the issue then becomes whether WCHDO could claim a beneficial interest in those assets. In other words, did it have discretion over the use of those funds that it did not have with respect to the federal funds that passed through the State to WCHDO in the form of HOME and CDBG grants? The Court thinks not.

Each grant contract contains a budget. Each of those budgets contain a breakdown of the total cost of each project. For example, in CDBG contract # 02–041G (Exhibit 12), the revised budget shows that $265,600 will be spent for down payment assistance; $13,000 for home buyer education; and $56,200 for project administration. In turn, the budget breaks down how much of each of those categories will come from grant money and how much is funded from other sources. In contract # 02–041G, the down payment assistance is funded with $250,000 of grant money and $15,600 of other funds; the $13,000 for home buyer education is completely funded by other funds; and the administrative expenses are funded with $29,400 from the grant and $26,800 from other funds. Thus, the grant contracts not only governed WCHDO's use of the grant funds, they also governed WCHDO's use of funds derived from other sources by including those funds in the overall project budget.

██ The Court has recognized above that an express trust has been created by contract provisions and federal regulations with respect to the bulk of the Revolving Loan Assets. Those funds are very clearly excluded from the bankruptcy estate. But for funds to be excluded from the estate by operation of § 541(d) they need not be subject to an express trust. *See, e.g., Davis v. Cox,* 356 F.3d 76 (1st Cir. 2004); *City of Farrell v. Sharon Steel Corp.,* 41 F.3d 92, 98–99 (3rd Cir.1994).

An example included in the legislative history to § 541 is instructive. It cites the example of insurance proceeds paid to an individual on account of medical treatment that the individual had received and for which the insurance proceeds were specifically intended to provide payment; it concludes that such payments are excluded from the bankruptcy estate because they are held in constructive trust for the person to whom the bill is owed. *Springfield v. Ostrander (In re LAN Tamers, Inc.),* 329 F.3d 204, 210 (1st Cir.2003) (citing S.Rep. No. 95–989 (1978), at 82, reprinted in 1978 U.S.C.C.A.N. 5787, 5868; H.R.Rep. No. 95–595 (1978), at 368, reprinted in 1978 U.S.C.C.A.N. 5963, 6324.). Thus, it is plain that Congress intended that in any situation where the debtor was intended to be a mere conduit of the property in its possession and was never intended to have the beneficial interest, § 541(d) excludes that property from the estate. Moreover, although the above cited legislative history refers to "constructive trust" the circumstances recited in the example do not involve elements of fraud or abuse of a confidential relationship that are typically present where a constructive trust is found. Here, funds have been raised from "other sources" for specific projects and are included in the project budget for payment of particular types of expenses. The Court finds that those funds were not intended to be subject to WCHDO's unfettered discretion. They were intended by the donors, the State and WCHDO to be used to carry out WCHDO's obligations under the various grant contracts. Under the circumstances, the Court finds that WCHDO's interest in the funds from "other sources" was nothing more than bare legal title, not a beneficial interest.

### 5) Case Law

The Court believes that the case law that addresses situations where claimants

are asserting that the debtor holds funds in constructive trust due to the debtor's wrongdoing is very different from the cases that address circumstances, such as the present case, where a debtor is in possession of assets that are intended to be used to carry out a government program.

In the former cases, "[t]o warrant imposition of a constructive trust over the property of a debtor, a claimant must (1) show fraud or mistake in the debtor's acquisition of the property; and (2) be able to trace the wrongfully held property." *Hill v. Kinzler (In re Foster)*, 275 F.3d 924, 926–27 (10th Cir.2001). Those cases typically require the use of the lowest intermediate balance rule to trace funds into the trust. *Id.* That tracing technique assumes that the first funds to come out of the common account are funds that are the legitimate property of the wrongdoer and that only after he has dissipated all of his legitimate funds does he begin to dissipate the funds subject to the constructive trust. Therefore, the lowest intermediate balance represents the amount of funds, which are subject to the constructive trust, that were not dissipated by the wrongdoer. *Id.*

But the cases that deal with the issue of whether funds in the possession of an agency engaged in carrying out state and federal programs become part of a bankruptcy estate differ in significant respects. First of all, these are not analogous to the constructive trust cases because the funds are not acquired through the debtors' fraud or other wrongdoing. More importantly, those case do not require that a formal trust be established. These are cases where the interests involved go beyond the interests of private party litigants. These cases involve the interest of the larger community of citizens whose tax dollars are used to carry public programs as well as the interests of those who are intended to benefit from that expenditure of public funds. The analysis consistently applied to this type of case reflects the balance between the public and private interests involved.

In the First Circuit case of *Springfield v. Ostrander (In re LAN Tamers, Inc.)* 329 F.3d 204 (1st Cir.2003), the debtor was a contractor engaged in the business of installing wiring to support high speed internet access in public schools. The E–Rate Program, established by the Telecommunications Act of 1996, generated funding for that purpose. The federal agency that carried out that program paid service providers like Lan Tamers, Inc. to install the necessary wiring. In some cases, in order to speed up the process, schools would make payment to the contractor at the time services were rendered. In those cases, the federal money paid to the contractors would then be passed back to the schools. The funds at issue in *Lan Tamers* were federal funds in Lan Tamers' possession at the time that it filed its bankruptcy petition. The funds had been paid to it and were intended to be passed through to the public school system that had already paid for the services that Lan Tamers had provided.

In that case, the First Circuit identified three factors that are common in the analysis of such cases: 1) "the role the debtor was intended to play;" 2) "the degree and intensity of regulatory control over the property in question;" and 3) "the extent to which recognizing a greater ownership interest—and thereby diverting the property in question to the creditors—would thwart the overall purpose of the regulatory scheme." *Id.* at 211–12; (citing *In re Joliet–Will County Comty. Action Agency*, 847 F.2d 430 (7th Cir.1988); *Official Comm. of Unsecured Creditors v. Columbia Gas Systems, Inc.*, 997 F.2d 1039 (3rd Cir.1993)).

In the present case, WCHDO is a non-profit agency that was created for the express purpose of administering housing programs for the benefit of the citizens of certain Colorado counties. All of the money in WCHDO's possession is intended either to be used to fund loans to homeowners or to pay WCHDO's expenses to administer the housing programs under its purview. WCHDO's non-profit structure; the contracts that it is subject to; and the regulations that govern its activities all lead to the conclusion that WCHDO's role with respect to these funds involves no equitable interest beyond payment of its administrative expenses. Its role is to operate housing programs established by federal law and subject to federal regulations and state oversight. WCHDO is bound to administer the Revolving Loan Assets in the interest of program beneficiaries.

WCHDO is subject to extensive regulation in its operation of grant programs. Each grant contract entered into evidence included a budget that included both the funds received from the grant plus funds raised from other sources. WCHDO was required to use those funds, regardless of their source, in the manner provided for in the contract budget and in accordance with federal regulations. WCHDO was subject to audits to insure that funds were used in accordance with the grant contract budgets and with the regulations. The Respondents elicited testimony to the effect that WCHDO exercised discretion as to who it would make loans to under the HOME and CDBG programs. Such discretion does not equate to a beneficial interest. The evidence made it clear that WCHDO's discretion was exercised within the strictures of the grant contracts and the regulations that governed those programs.

The final *Lan Tamers* factor focuses on how the diversion of program funds into the hands of creditors would affect the overall purposes of the regulatory scheme. The greater the negative impact that the diversion of funds would have on the programs that a debtor administers, the greater the presumption that the debtor was never intended to have an equitable or ownership interest in the funds. Testimony demonstrated that the purpose of operating the HOME and CDBG programs as loan programs was to generate income that would make them more self-supporting.[4] That means that the Revolving Loan Assets were not only intended to fund loans to current program beneficiaries, but that the assets were intended to generate principal and interest payments that would be available to fund similar loans in the future. The Court finds that purpose would be utterly defeated by diversion of the Revolving Loan Assets to WCHDO's creditors. By contrast, restoring those funds to the State would allow them to continue to be available for their intended purpose.

An analysis of the three *Lan Tamers* factors convinces the Court that WCHDO was never intended to have any equitable interest in the Revolving Loan Assets. As a non-profit organization, which was formed for the express purpose of administering housing programs, it was never intended to be an owner of the Revolving Loan Assets. From its inception, it was intended as a mere custodian of those assets to be administered for the benefit of program beneficiaries and the citizens of Colorado.

---

4. "Self supporting" would probably be an overly optimistic term since the testimony also established that the cost of administering WCHDO's housing programs was somewhat greater than the income generated.

The *Lan Tamers* court based its analysis at least in part on the Seventh Circuit case of *In re Joliet–Will County Cmty. Action Agency,* 847 F.2d 430 (7th Cir. 1988). The debtor in that case was a nonprofit organization which was created to operate a number of community service programs. The trustee had moved to sell certain assets of the debtor to pay administrative expenses. The federal and state agencies which granted the funds to that debtor claimed an ownership interest in those funds. According to Judge Posner,

> The answer depends on the terms under which the grants were made. Did they constitute Joliet–Will a trustee, custodian, or other intermediary, who lacks beneficial title and is merely an agent for the disbursal of funds belonging to another? If so, the funds (and the personal property bought with them) were not assets of the bankrupt estate. Or were the grants more like payment under a contract for promised performance not actually performed? The promisee would have a contractual claim for the return of the money he had paid, but he would not have a property right in the money.

*Id.* at 432 (citations omitted).

Judge Posner found that the terms of the grants imposed controls on the use of the grant money such that the debtor had limited discretion and was bound to spend the grant money in accordance with the budget contained in the grant. Under the circumstances, the debtor functioned as an "agent to carry out specified tasks rather than a borrower, or an entrepreneur using invested funds." *Id.* Under those circumstances, that court found that the debtor did not have an equitable interest in the grant money and property at issue and that they did not become property of the bankruptcy estate.

This case has striking similarities to the *Joliet–Will* case. Both agencies were nonprofit agencies created for the express purpose of carrying out programs to be funded by government grants. In both cases, detailed regulations give the debtors little discretion with respect to how the grant funds are to be spent. In both cases the manner in which the grants are to be used was set out in the budget accompanying the grant contracts. Here, as in *Joliet–Will,* there is no evidence that the Debtor was ever intended to have an equitable interest in the Revolving Loan Assets.

### D. Outstanding Costs of Administration

 The Court will raise one final issue that has not been discussed by the parties. The grant contracts allowed WHCDO to be reimbursed for its expenses incurred in the administration of the Revolving Loan Assets. Testimony at hearing indicated that the Trustee has engaged the services of an individual to collect and account for payments that are owed to WCHDO on various note obligations that are part of the Revolving Loan Assets. The Court will allow the Trustee to hold back 10% of the cash portion of the Revolving Loan Assets if he believes that he has any claim for reimbursement of expenses out of the Revolving Loan Assets. If the Trustee does retain a portion of the Revolving Loan Assets for the purpose of making such a claim, his application for reimbursement must be filed with the Court no later than fifteen (15) days from the date of this Order.

### III. CONCLUSION

As discussed above, the State is the proper party to act on behalf of program beneficiaries for whom the Revolving Loan Assets were held by WCHDO. The State is, therefore, the proper party to receive

the Revolving Loan Assets so that they may be returned to the purpose for which they are intended.

The Court finds that WCHDO lacked any equitable interest in the Revolving Loan Assets. Provisions of the governing statutes created an express trust at least with respect to the portion of the Revolving Loan Assets that was derived from federal grant funds. Beyond that, the Court has analyzed the overall regulatory scheme; the amount of discretion that WCHDO had with respect to its use of the Revolving Loan Assets; the fact that WCHDO was created as a non-profit organization for the specific purpose of carrying out certain housing programs; and the negative impact on those housing programs that would result from including the Revolving Loan Assets in WCHDO's bankruptcy estate. The Court finds no indicia that WCHDO ever possessed any ownership or equitable interest in the Revolving Loan Assets. Accordingly, it is

**ORDERED** that the State of Colorado's *Motion for Order Directing Trustee to Release all Claims to Revolving Loan Fund Account and to Deliver Possession Thereof to the State of Colorado* is hereby GRANTED; it is further

**ORDERED** that, if the Trustee has no claim to any administrative costs to be paid from the Revolving Loan Assets, he is directed to turn over possession of those assets to the state of Colorado immediately. If the Trustee believes that he does have such claim, he is hereby authorized to withhold 10% of the cash included in the Revolving Loan Assets currently on hand and is directed to file his motion asserting the claim in this Court no later than fifteen (15) days from the date of this Order. He is further directed to turn over the remaining cash and non-cash assets immediately. If the Trustee does assert a claim to reimbursement of expenses from the Revolving

Loan Assets, he is directed to continue in possession of the funds withheld under this Order until this Court has made its determination on his claim.